UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANN NICOLE NORRIS,

      Plaintiff,                         Civil Action No. 17-12792

v.                                  HON.  MARK A. GOLDSMITH
                                  U.S. District Judge
                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Ann Nicole Norris ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #24] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #17] be DENIED.

## PROCEDURAL HISTORY

Plaintiff originally applied for DIB and SSI benefits on January 4, and January 23, 2008 respectively (Tr. 25). After the claims were denied, she filed suit in this Court on May 5, 2011. *Norris v. Commissioner of Social Security,* Case no. 11-11974. On August 20, 2012, the Honorable Mark A. Goldsmith remanded the case to the administrative level for further proceedings. Case no. 11-11974, *Docket #16-17.* Following an administrative rehearing, On January 31, 2014, Plaintiff was granted benefits for a closed period between March 23, 2007 through June 27, 2012 (Tr. 126-136). Plaintiff states that she returned to work on June 28, 2012. *Plaintiff's Brief,* 2, *Docket #17,* Pg ID 732.

Plaintiff reapplied for DIB and SSI on October 22, 2014 and October 28, 2015 respectively, alleging disability as of August 23, 2013[1] (Tr. 238, 248). After the initial denial of benefits, Plaintiff requested an administrative hearing, held on July 15, 2016 in Livonia, Michigan before Administrative Law Judge ("ALJ") Henry Perez, Jr. (Tr. 59). Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 61-84), as did Vocational Expert ("VE") Joanne White (Tr. 84-91). On August 16, 2016, ALJ Perez found that Plaintiff was capable of performing her past jobs as an auto parts clerk/deliverer and phone analyst (Tr. 39-40). On July 26, 2017, the Appeals Council denied review (Tr. 1-3). Plaintiff filed suit in this Court on August 24, 2017. *Docket #1.*

---

[1]Plaintiff alleges that she became disabled again three days after the order of remand was entered in the earlier case. Case no. 11-11974, *Docket #16-17.*

## BACKGROUND FACTS

Plaintiff, born August 4, 1970, was 46 when the ALJ issued his decision  (Tr. 40, 238).  Her application for benefits states that she completed 11th grade and worked previously as an auto parts deliverer, phone analyst, and sales representative (Tr. 262).  She alleges disability as a result of sciatica, arthritis, Chronic Obstructive Pulmonary Disease ("COPD"), Carpal Tunnel Syndrome ("CTS"), leg spasms, back pain, and depression (Tr. 261).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She stood 5' 9" and weighed 215 pounds (Tr. 62).  She overate due to depression and stress (Tr. 62).  She lived in a single family home with her nephew (Tr. 62).  She had lived with her nephew for three years (Tr. 62).  Her nephew helped her with the household chores (Tr. 63).  Plaintiff's household activity was limited to washing dishes and cleaning the kitchen (Tr. 63).  She was unable to sweep, mop, or dust due to fatigue and hand and back problems (Tr. 63).  She was unable to perform household activity for more than 10 minutes and required rest periods allowing her to recline or sit with her legs elevated (Tr. 63).  She wore braces for CTS and for her shoulder condition (Tr. 63).  She also used an ankle brace and required the use of a cane (Tr. 64).  She experienced ankle problems brought on by an injury  the previous November (Tr. 64).  She owned a back brace but declined to use it due to uncomfortable "rubbing" (Tr. 64).  She had been told by a treating source that the driving requirements of her most recent job exacerbated both her back condition and hypertension

(Tr. 65).

Since the end of her previous period of disability, she worked for around a year so she could "keep the house" where she was living (Tr. 65). Her back condition had deteriorated since 2012 (Tr. 65). She had used the cane since as early as 2007 (Tr. 66). She went back to work in 2012 because she was losing her home due to lack of income (Tr. 66). She injured her right leg after returning to work in 2012 and was advised by her physician, Dr. Fingal, to quit work (Tr. 65-66). She had been told to engage in water aerobics (Tr. 67). She coped with the leg problems by applying ice packs up to four times a day and elevating her legs somewhere between hip and chest level most of the day to avoid swelling (Tr. 67-68). She took Motrin 800 and Gabapentin for the back and leg problems and Trazodone to help her sleep at night (Tr. 69). Despite the use of Trazodone, she experienced sleep disturbances due to back pain and depression (Tr. 70). She took daytime naps approximately every other day (Tr. 70).

Plaintiff was able to perform self care tasks independently except for buttoning her pants due to gripping problems (Tr. 70). She was hoping to find a one-bedroom apartment on one floor with a washer and dryer where someone could come in to clean then leave (Tr. 91). She experienced muscle spasms in hot weather (Tr. 72). She took Flexeril for muscle spasms (Tr. 73). Due to CTS she sometimes experienced problems gripping but noted that the problems occurred once or twice a week at most (Tr. 74-75). She experienced more trouble with shoulder pain (Tr. 74).

-4-

Her mental health treatment was now limited to seeing a counselor once every three months (Tr. 75).  Symptoms of depression including daily crying jags, social isolation, and preoccupation with her physical conditions (Tr. 76-77).  The condition of COPD affected her mostly at night, along with sinus problems (Tr. 75).  She used two inhalers every day (Tr. 75).  She was unable to cope with any airborne hazards (Tr. 76).  She was able to sit for up to 20 minutes, stand for 15 minutes (with the use of a cane), and walk for the length of two houses (Tr. 79).  She could lift a gallon of milk (Tr. 79).  She had been told by Dr. Fingal not to lift more than five pounds (Tr. 80).  Her most comfortable position was lying on a couch with pillows between her legs or lying in her reclining chair with her legs elevated (Tr. 80).  She was in the process of getting "a second opinion" regarding debridement ankle surgery recommended by a medical source (Tr. 81).

Plaintiff admitted that she continued to use marijuana on a limited basis to combat stress (Tr. 81).  She used alcohol on weekends (Tr. 82).  She used Zoloft for depression but did not believe that it was working well (Tr. 82).  In response to questioning by the ALJ, Plaintiff stated that in her job as an auto parts deliverer she was not required to lift more than 10 pounds but was required to be "on her feet" (Tr. 83).  Her job as a phone analyst did not require any lifting but required her to sit for long periods (Tr. 84).

### B.    Medical Evidence[2]

### 1. Treating Sources

In December, 2012, Plaintiff sought emergency treatment, reporting level "10" out of 10 right leg pain after performing heavy lifting at work (Tr. 442).  She demonstrated full motor strength in all extremities (Tr. 443).  Records note a "probable . . . exacerbation of her sciatica" (Tr. 443).  February, 2013 records by Rhona A. Fingal, M.D. note diagnoses of backache, depressive disorder, and esophageal reflux (Tr. 485).  Dr. Fingal advised Plaintiff to stop smoking due to suspected COPD (Tr. 465).  She found that Plaintiff should be limited to no more than 20 pounds and restricted from driving due to the sedating effect of prescription medication (Tr. 463-465).  Treating notes from the same month note that Plaintiff's prescriptions for Spiriva and Vicodin were renewed (Tr. 466).  Dr. Fingal noted that driving aggravated the condition of sciatica and as a result, Plaintiff needed "to stop driving and work indoors" (Tr. 525).

The following month, the prescription for Vicodin was stopped (Tr. 462).  Plaintiff was again advised to stop smoking (Tr. 461).  Dr. Fingal's August, 2013 records note a diagnosis of major depression, "single episode" (Tr. 460).  June, 2014 pulmonary testing showed oxygen saturation rates of 98 percent (Tr. 458).  Respiration rhythm and depth were deemed normal (Tr. 519).  Plaintiff did not exhibit respiratory problems (Tr. 457).  She did

---

[2]Records significantly predating the alleged onset of disability date of August 23, 2013 are omitted from the present discussion.

not exhibit soft tissue swelling (Tr. 457). July 1, 2014 and September 15, 2014 oxygen saturation rates were 100 percent (Tr. 456, 452). Plaintiff was re-prescribed the continued use of an inhaler for "cough, wheezing, and shortness of breath" (Tr. 516). July, 2014 records by Aashit Shah, M.D. noted Plaintiff's report that she was taking time off work because of leg pain and occasional muscle spasms (Tr. 435). He noted that she did not require the use of a cane (Tr. 435). Plaintiff reported that she was trying to quit smoking cigarettes but continued to smoke marijuana once a week (Tr. 435). Neurological testing of the lower extremities was unremarkable (Tr. 435, 569). Plaintiff exhibited normal muscle tone, a 5/5 hand grip bilaterally, and a normal gait except that she was unable to "toe walk on the right" (Tr. 431). Dr. Shah found no "objective findings of weakness or sensory loss" but referred Plaintiff for physical therapy (Tr. 432).

The following month, Plaintiff sought emergency treatment for lumbar spine pain radiating into the right buttock, thigh, and leg (Tr. 445). Plaintiff demonstrated 5/5 strength in all extremities (Tr. 445). Nerve conduction studies of the lower extremities were unremarkable (Tr. 446). A chest x-ray showed "stable COPD changes" with "no definite pulmonary nodule" (Tr. 447).

February, 2015 oxygen saturation testing was at 100 percent (Tr. 514). The same month, Plaintiff demonstrated full strength in all extremities (Tr. 550, 558). Nerve conduction studies of the upper extremities from the following month show a sensory mononeuropathy across the right wrist, accompanied by a notation that the "mildly abnormal

findings" did "not adequately account for" Plaintiff's complaints of limitation (Tr. 567).

Records note that in March, 2015, nerve conduction studies were consistent with mild right-

sided CTS (Tr. 553). Motor strength testing, including right hand grip, was wholly normal

(Tr. 554). March, 2015 records note Plaintiff's report of depression (Tr. 619). Plaintiff was

assigned a GAF of 40 due to psychological problems, migraines, sciatica, neuralgia, CTS -

bilateral, and COPD[3] (Tr. 620, 636). She appeared fully oriented with good judgment (Tr.

635). Treatment options included "psychosocial interventions and somatic interventions"

(Tr. 635). May, 2015 records note "intermittent wheezing with good results from Albuterol

(Tr. 605). Neurological records note Plaintiff's report of muscle spasms of the right leg but

an improvement in radicular symptoms from physical therapy (Tr. 553). Psychological intake

records from the same month note Plaintiff's report of poor concentration and motivation (Tr.

54). Plaintiff reported reduced contact with friends and family but that she was able to

perform self care tasks and "personal matters" (Tr. 55). She was assigned a GAF of 65 (Tr.

57). September, 2015 records note a ganglion cyst on the right wrist (Tr. 600, 614). Records

from the same month note that in terms of COPD, Plaintiff was "doing actually quite well"

with no coughing or wheezing (Tr. 615). Clinical studies were consistent with a diagnosis

of CTS (Tr. 616). Plaintiff was advised to continue using wrist braces (Tr. 616, 632).

---

[3]

A GAF score of 31 to 40 indicates "some impairment in reality testing or
communication OR major impairment in several areas such as work, school, family relations,
judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders–Text
Revision* ("*DSM–IV–TR*"), 34.

October, 2015 psychological treating records note that Plaintiff's depression, brought on by physical symptoms, was improving (Tr. 50). She denied medication side effects and reported that she continued to care for grandchildren (Tr. 50). She was assigned a GAF of 70 with the highest GAF in the past 12 months listed at 65[4] (Tr. 52).

In November, 2015, Plaintiff sought treatment after injuring her right ankle (Tr. 594-597, 611). Imaging studies were negative for fracture (Tr. 645, 647). Imaging studies showed mild to moderate osteoarthrosis of the bilateral knees (Tr. 592, 608). In December, 2015, Plaintiff reported that she was able to wear a normal shoe despite mild right ankle swelling (Tr. 587).

January, 2016 physical therapy records note a normal mental status with "very mild" arthritis of the knee and a normal gait (Tr. 581). Plaintiff was advised to lose weight (Tr. 581). Treating records from the same month note that Plaintiff had not filled a pain prescription for ankle pain (Tr. 585). An x-ray of the lumbar spine showed disc spurring with degenerative changes at L5-S1 (Tr. 591, 644). A chest x-ray from the following month was unremarkable (Tr. 644).

An April, 2016 MRI of the right ankle showed possible joint impingement (Tr. 643). Records from the next month by Ferras Zeni, M.D. state that Plaintiff was offered ankle arthroscopy to debride "any" scar tissue (Tr. 663). Plaintiff stated that she was "open to the

---

[4]

GAF scores in the range of 61–70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

idea of arthroscopy if her symptoms [did] not improve in the next two months" (Tr. 663).

Psychological counseling notes from the same month note that Plaintiff enjoyed being with her grandchildren but was "brought down" by four funerals in the past few months and ankle pain (Tr. 47). Plaintiff reported that she continued to care for her grandchildren (Tr. 47). She exhibited a calm affect, good memory, and good judgment (Tr. 48).

## 2. Non-treating Sources

In December, 2014 Patrick Murphy, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report that she was "'okay, but tired'" (Tr. 508). Plaintiff denied tobacco or illicit drug use (Tr. 510). She reported spending her days watching television, babysitting her grandson, and reclining when needed (Tr. 510).

Dr. Murphy noted that Plaintiff sat and walked without difficulty and had good hygiene and grooming (Tr. 510). She exhibited a normal affect with a normal level of anxiety (Tr. 510). She exhibited a firm handshake (Tr. 511). She did not experience memory or concentrational problems (Tr. 511). Dr. Murphy found that Plaintiff's psychological condition would "remain the same . . . without further intervention" (Tr. 511). He found Plaintiff's work-related psychological abilities "not impaired" (Tr. 512).

The same day S. Seibles, M.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's report of up to "3" out of 10 back pain (Tr. 499). She reported that she could sit or stand for around 30 minutes and walk for half a block (Tr. 499). She denied tobacco use but reported daily marijuana use (Tr. 500). She reported independence in self

care tasks and driving (Tr. 501). She denied headaches, shortness of breath, wheezing, or edema (Tr. 501). She reported muscle weakness and pain but denied tremors, weakness, or seizures (Tr. 502). Dr. Seibles noted that Plaintiff sat comfortably for the entire examination and exhibited a normal gait (Tr. 503-504). Range of motion and neurological testing, including the wrists and fingers, was normal (Tr. 504-504). Plaintiff did not bring an assistive device to the examination (Tr. 504). Dr. Seibles found no limitation in sitting, standing, or walking but limited Plaintiff to carrying 15 pounds frequently and occasionally (Tr. 505). He limited Plaintiff to frequent postural activity but found no limitation in manipulative, visual, communicative, or environmental functioning (Tr. 506).

In January, 2015, Kathy A. Morrow, Ph.D. completed a non-examining review of the treating and consultative records for the relevant period, finding that Plaintiff experienced only mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 146). The same month, Muhammad Ahmed, M.D. performed a non-examining review of the treating and consultative records, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; and sit, stand, or walk for six hours in an eight-hour workday (Tr. 148). Dr. Ahmed limited Plaintiff to occasional pushing and pulling (Tr. 148). He found that Plaintiff was limited to occasional climbing, stooping, kneeling, crouching, and crawling but could perform frequent, but not constant balancing (Tr. 148). He found that Plaintiff should be limited to frequent handling and fingering (Tr. 149). He found the absence of visual and communicative limitations but precluded all work involving airborne

-11-

hazards (Tr. 150).

### C.      Vocational Expert Testimony

VE Joanne White testified that Plaintiff had received a GED (Tr. 85).  She classified Plaintiff's former work as a auto parts deliverer as skilled and exertionally light and phone analyst semiskilled/sedentary[5] (Tr. 85-86).  Noting Plaintiff's testimony that she also worked behind the counter in the auto parts store, VE White found that Plaintiff possessed transferable skills for customer service positions "related to receiving information regarding the auto parts and helping customers to obtain the right parts" (Tr. 86).

The ALJ then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, and work background:

> [A]ssume that such a person has an exertional limitation of lifting 20 pounds occasionally, 10 pounds frequently, sitting six hours, standing six hours, walking six hours, pushing and pulling as much as she can lift and carry. There's frequent handling bilaterally, frequent feeling, fingering bilaterally. There's a need to, climbing ramps and stairs is occasional, climbing ladders, ropes, and scaffolds is occasional.  Balancing is frequent, stooping is occasional

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

to no more than 50 percent.  Kneeling is occasional, crouching is occasional to no more than 50 percent.  Crawling is occasional.  There's also a need to avoid all exposure to respiratory irritants. . . . . [A]t the skilled level, could such an individual . . . be able to perform the Claimant's past relevant work?  (Tr. 87).

The VE replied that the above limitations would allow for the past relevant work as an auto parts counter person/deliverer as well as the phone analyst position (Tr. 87).  The VE testified that if Plaintiff's testimony that she was unable to sit for more than 10 minutes or stand for 20; walk only two house lengths with the use of a cane; or, could not lift even 10 pounds, all work would be precluded (Tr. 87-88).  The VE noted that Plaintiff's professed claims (if credited) that she needed to recline most of the day with her legs elevated, nap three days a week, experienced fingers "locking up once or twice a week," or, was unable to leave the house, would also preclude all work (Tr. 88).

In response to questioning by Plaintiff's attorney, the VE testified that a limitation to occasional (rather than *frequent*) manipulative activity would preclude all of the past relevant work (Tr. 89).  She testified further that the need for a sit/stand option would also preclude the past relevant work (Tr. 89).  She testified that a limitation to five pounds lifting would not affect the phone analyst position (Tr. 90).  She stated that the need to be absent from work two days a month, or, be off task for at least 15 percent of the workday would preclude all gainful employment (Tr. 90-91).

### D.  The ALJ's Decision

Citing the medical records, ALJ Perez determined that between August 23, 2013 and August 16, 2016, Plaintiff experienced the severe impairment of "degenerative disc disease"

but that  the condition did not meet or medically equal one of the impairments found in 20

C.F.R. Part 404 Appendix 1 Subpart P (Tr. 27, 32).  He found that Plaintiff experienced mild

limitation in activities of daily living, social functioning and in concentration, persistence,

or pace (Tr. 31).  He found that the conditions of COPD; arthritis of the shoulder and knee;

CTS; migraine headaches; obesity; and depression were non-severe impairments (Tr. 28-30).

The ALJ determined that Plaintiff experienced only mild limitation in activities of daily

living, social functioning, and concentration, persistence, or pace (Tr. 31).

The ALJ found that Plaintiff retained the Residual Functional Capacity to perform

exertionally light work with the following limitations:

> [S]he is limited to frequent handling and fingering bilaterally; she can only
> occasionally climb ramps, stairs, ladders, ropes, or scaffolds; she can
> frequently balance,; she can occasionally kneel and crawl; she can perform
> occasional to no more than 50 percent stooping and crouching; and she must
> avoid any exposure to dusts, odors, fumes, and pulmonary irritants (Tr. 33).

Citing the VE's findings, the ALJ found that Plaintiff could perform her past relevant work

as an auto parts clerk/deliverer and phone analyst (Tr. 39).

The ALJ discounted Plaintiff's alleged degree of physical and psychological

limitation, noting that while Plaintiff had "a history of degenerative disc disease of the

lumbar spine, the objective medical evidence is not consistent with the degree of

symptomatology and functional limitation she has alleged" (Tr. 35).  He noted that EMG

studies of the lower extremities during the relevant period were wholly unremarkable (Tr.

35).  He noted that for the same period, Plaintiff demonstrated generally full strength in the

upper and lower extremities and a normal gait (Tr. 35).

The ALJ noted that observations of an antalgic gait correlated with short-term limitations due to a sprained ankle (Tr. 35). He remarked that a single trip to the emergency room was precipitated by "heavy lifting" (Tr. 36). The ALJ cited Dr. Seibles finding that Plaintiff could perform frequent postural activity and did not experience any manipulative limitations (Tr. 36). The ALJ observed that none of the records showed lower extremity edema supporting the need to elevate the legs (Tr. 36). He noted that Plaintiff's admitted ability to babysit for her young grandson stood at odds with her claims of extreme psychological and physical limitation (Tr. 37). The ALJ noted that he was not bound by the findings pertaining to the closed period of benefits ending on June 27, 2012 but stated that he had nonetheless considered the previous determination (Tr. 38). He noted that since June 27, 2012, Plaintiff's condition had "demonstrated improvement in clinical signs and findings, including the absence of pain behaviors, improved muscle strength in the lower extremities, and a normal EMG study of the right lower leg" (Tr. 38).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*,   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has

the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes three arguments in favor of remand, contending first that the ALJ failed to consider her mental limitations in making the Step Four determination. *Plaintiff's Brief,* 10-12, *Docket #17,* Pg ID 740.   Plaintiff argues second that the ALJ erred by finding that the conditions of COPD , CTS, and depression did not create significant work-related limitations. *Id.* at 12-17.  Third, Plaintiff argues that even if the conditions of COPD, CTS, and depression were properly characterized as "non-severe," the ALJ was required to take into account their effect on her work abilities. *Id.* at 17.

Plaintiff's contentions regarding the mental limitations will be considered first. Because resolution of Plaintiff's second claim of error is also dispositive of her third argument, the two can be considered in tandem.

### A.  The Mental Limitations

In this argument, Plaintiff acknowledges that the ALJ was not required to incorporate "mild" psychological limitation in the RFC. *Id.* at 10-11.  However, she faults the ALJ for failing to discuss how the limitations, although mild, effected her activities of daily living, social functioning, and concentration, persistence, or pace. *Id.* at 11 (*citing Biehl v. CSS,*

2015 WS at *21 (E.D. Mich. Feb. 20 2015).

At the second of the sequential analysis, the ALJ considers whether the claimant has a severe medically determinable physical or mental impairment that meets the duration requirement of the regulations and which significantly limits the claimant's ability to do basic work activities.  20 C.F.R. §§ 404.1520(a)(4)(ii) and (c).   An "impairment or combination of impairments ... [is] found 'not severe' and a finding of 'not disabled' is made ... when medical evidence establishes only a slight abnormality or [] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856,*3 (1985). "In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process.' " *Anthony v. Astrue,* 266 Fed. Appx. 451, 457 (6th Cir. February 22, 2008)(*citing Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1998)). "The goal of the test is to 'screen out totally groundless claims.' " *Id.* (*citing Farris v. Secretary of Health & Human Services,* 773 F.2d 85, 89 (6th Cir. 1985)).  20 C.F.R. § 404.1522(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." *See also* SSR 85-28*, supra,* at *3. "Basic work activities" include the physical functions of "walking, standing, sitting" as well as the capacity for "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and, "[d]ealing with changes in a routine work setting." *Id.*

Here, the ALJ found that for the period from August 23, 2013 to the date of the administrative decision the condition of affective disorder (depression) was a medically determinable impairment but did not cause more than minimal limitation in her ability to perform basic mental work activities and thus, did not constitute a "severe" impairment (Tr. 30).

As discussed above, the ALJ's finding that Plaintiff experienced only mild limitation due to depression is overwhelmingly supported by the consultative and non-examining findings (Tr. 52, 57, 146, 511-512).  *See* II.B.1.-2., *above.*  The ALJ noted that Plaintiff "regularly showed normal mood and mental functioning during evaluations" with "normal thought content, goal-directed thought process, normal perception, and normal attention and concentration" (Tr. 30).  He cited Dr. Murphy's finding that depression did not create any level of functional limitation (Tr. 30).  He observed that Plaintiff was "friendly and cooperative with a normal affect" consistent with the treating evidence showing an unremarkable mental state (Tr. 32).  He accorded "great weight" to Dr. Murphy's findings (Tr. 32).

Plaintiff does not argue that the RFC should include a reference to psychological limitation.  Rather, she argues that the rationale for the non-disability ought to have included consideration of her the mild psychological limitations.  *Plaintiff's Brief* at 11.  She cites SSR 96-8p which states that "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"

1996 WL 374184, at *5 (July 2, 1996).  She asserts that the ALJ's discussion of the mild limitations is limited to the "catch-all" statement that "all of the medically determinable impairments have been considered at the remaining steps of the sequential evaluation" under 20 C.F.R. 404.1523 (Tr. 32).

First, the ALJ's "catch-all" statement is prefaced by an exhaustive two-page rationale for finding that depression did not create *any* level of work-related limitation  (Tr. 30-32 *citing* 512).  Aside from the adoption of Dr. Murphy's findings, the ALJ noted  that Plaintiff was well groomed and personable with a good memory and concentration; got along well with family and talked on the phone every day; and exhibited good mathematical skills and concentrational abilities (Tr. 31).  The ALJ's statement that depression had been considered at the later steps of the analysis is *followed* by additional discussion of the treating, consultative, and non-examining psychological records  (Tr. 32).  For example, the ALJ explained his reasons for rejecting the assignment of a GAF of 40 by one social worker on one occasion, noting that the score implied "some impairment in reality testing or communication or major impairment in several areas" and was "grossly at odds with the description offered in connection with Claimant's examination" which showed goal-directed thought, normal attention and concentration, normal executive function, and good insight and judgment (Tr. 32, 620, 636).  The ALJ's finding that the GAF of 40 was an anomaly is consistent with my own review of these records and the evidence as a whole.

Plaintiff relies on *Biehl v. CSS*, which states that "although the ALJ was arguably not

required to incorporate mild limitations into plaintiff's RFC, she was required to consider those limitations in formulating plaintiff's RFC . . ." *Id.* at *21. *Biehl* rejected the premise that a discussion related to the "mild" findings at Step Two was sufficient to show that they were considered when crafting the RFC. *Id.*   The Court assumes for the sake of argument that the ALJ's page-long discussion  of why the psychological problems were considered mild is insufficient to show the mild limitations were later considered (Tr. 31).  However, on the preceding page (Tr. 30) and on the better of part of the next page (Tr. 32), the ALJ discussed the content of the treating, consultative, and non-examining consultative records and the weight given to the respective sources (Tr. 32).  His adoption of Dr. Murphy's finding that Plaintiff did not experience any level of work-related psychological limitation adequately accounts for the lack of reference to depression in the RFC.  While discussion of the weight accorded the medical and psychological sources is usually found *after* the RFC in the administrative determination, the fact that the ALJ  determined that the depression did not interfere with Plaintiff's basic work activities one page prior to RFC rather than after (coupled with his statement that he considered the non-severe impairments in crafting the RFC) is not fatal to the analysis (Tr. 33) .

While Plaintiff argues that the Dr. Murphy's findings are silent as to  her "ability to use judgment" and deal with changes in a work setting, the ALJ cited treating medical records showing that Plaintiff showed "normal executive function, and good insight and judgment" (Tr. 32).  Despite the consultative examiner's "failure" to explicitly discuss

Plaintiff's "judgment" and ability to adapt to workplace changes, the ALJ noted that the record as a whole supported good functioning in these areas (Tr. 30-32). My own review of the records likewise shows that Plaintiff exhibited consistently good judgment, concentration, and memory (Tr. 32, 48, 50).

Finally, Plaintiff argues that the ALJ erred by failing to reference behavioral health records from 2015 and 2016 which were submitted after the hearing but prior to the issuance of the administrative determination. *Plaintiff's Brief* at 12 (*citing* Tr. 47-57). However, the lack of discussion of the 11 pages submitted after the hearing does not provide grounds for remand. First, it is well settled that the "failure" to discuss every page of the medical transcript does not provide grounds for remand. *See Kornecky v. CSS,* 167 F. App'x 496, 508–9 (6th Cir. February 9, 2006)(no requirement that the ALJ discuss every piece of evidence in the administrative record). Second and more obviously, the 11 pages of psychological records cited by Plaintiff detract from rather than support her claims of limitation. For example, October, 2015 treating records state that Plaintiff's depression was improving and that she was able to care for her grandchildren (Tr. 50). She was assigned a GAF of 70, consistent with the bulk of the records showing only mild psychological limitation (Tr. 50). Likewise, while April, 2016 records state that Plaintiff was "brought down" by an ankle injury, she continued to care for her grandchildren and exhibited a calm affect, good memory, and good judgment (Tr. 48). The ALJ permissibly found that Plaintiff's ability to watch her grandchildren on a regular basis (demanding significant

physical and cognitive resources) undermined her claims of disability (Tr. 37). None of these records or activities suggests greater than a minimal degree of limitation in the basic work activities of judgment, interacting with supervisors and coworkers, and dealing with workplace changes. It is worth noting that Plaintiff does not allege that she quit her most recent job as an auto parts deliverer as a result of psychological issues but rather as a result of sciatica. Because the ALJ's discussion and conclusions adequately address the omission of a psychological impairment from the RFC, his findings should remain undisturbed.

### B. The Omission of COPD, CTS, and Depression from the Step Two Findings

Plaintiff argues second that the ALJ erred by finding that COPD, CTS, and depression did not create significant work-related limitations. *Plaintiff's Brief* at 12-17. Citing SSR 96-3p, Plaintiff notes that a non-severe impairment should have "'no more than a minimal effect on the ability to do basic work activities.'" *Id.* at 12; 1996 WL 374181 at *1 (July 2, 1996). In her third argument, Plaintiff contends that even if the omission of these conditions at Step Two does not constitute reversible error, the ALJ's failure to discuss the conditions at the later steps of the sequential analysis requires a remand for further fact-finding. *Plaintiff's Brief* at 17-19.

As an initial matter, the ALJ's finding that COPD, CTS, and depression were not severe impairments is well supported and explained. As to COPD, the ALJ noted that the symptoms of COPD had not worsened since her 2011 report that she experienced relief of symptoms with the prescribed medication (Tr. 28). He noted that she denied shortness of

breath or cough and that oxygen saturation levels had "never fallen below the mid-90s, even during exacerbations" (Tr. 28).  The ALJ's finding that Plaintiff experienced consistently good control of symptoms except on one occasion where she ran out of medicine is consistent with my own review of the treating records showing consistently high oxygen saturation rates (Tr. 458, 514) and normal respiration rhythm and depth (Tr. 519).  A chest x-ray was negative for pulmonary nodules (Tr. 447).  The ALJ did not err in noting that Plaintiff's claim of significant limitation due to COPD was undermined by her continued use of tobacco and marijuana (Tr. 28).  "The Sixth Circuit has repeatedly held that a claimant's continued smoking militates against the credibility of [a claimant's] disabling breathing [dis]order." *Siler v. Astrue,* 2012 WL 2603656, at *7 (E.D.Ky. July 5, 2012)(*citing Brown v. SSA*, 221 F.3d 1333, at *1 (6th Cir.2000)(table)); *See also Sias v. Secretary of HHS*, 861 F.2d 475, 480 (6th Cir. 1988)(allegations of disability undermined by failure to follow the prescribed medical regime).

While Plaintiff argues that the record "as a whole shows a waxing and waning" of the symptoms of COPD, the ALJ did not err in noting that the condition rarely "waxed" and "waned" the vast majority of the time.  None of the treating, consultative, or non-examining sources found that the condition precluded the walking requirements of light work.  While Plaintiff's contention that the ALJ failed to consider COPD when crafting the RFC is flatly contradicted by the limitation to work free of "dusts, odors, fumes, and pulmonary irritants" found in the RFC itself (Tr. 33).  The limitation, drawn directly from Dr. Ahmed's non-

examining findings, is supported by substantial evidence (Tr. 150). Even assuming that the ALJ erred in finding the condition of COPD non-severe, the failure to acknowledge an impairment at Step Two is harmless error provided that it is addressed at the remaining steps of the sequential analysis. *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Fisk v. Astrue*, 253 Fed.Appx. 580, 583-584, 2007 WL 3325869, *4 (6th Cir. November 9, 2007). The ALJ's acknowledgment of the condition of COPD later in his analysis, cures the arguable "error" at Step Two.

For overlapping reasons, the ALJ's finding that the condition of CTS was non-severe does not provide grounds for remand. The ALJ acknowledged Plaintiff's testimony that she had pain in her hands on occasion and a nerve conduction study taken during the relevant period showing mild CTS of the right wrist (Tr. 29). However, the ALJ noted that Plaintiff repeatedly demonstrated full grip strength, consistent with my own review of the records (Tr. 29, 431, 503-504, 554). He noted that Plaintiff used wrist braces only intermittently and demonstrated only mild clinical abnormalities (Tr. 29). While Plaintiff points out that CTS was deemed a "severe" impairment for the closed period ending on June 27, 2012, *Plaintiff's Brief* at 15, the ALJ noted that while he was not bound by the previous findings, he had considered them but found that the "new evidence" supported "a different determination with respect to the [RFC]" (Tr. 38).

Again, even assuming that the ALJ erred by finding that CTS was mild, limitations created by the condition were adequately addressed in the RFC which includes a limitation

to "frequent handling and fingering bilaterally" (Tr. 33). The limitation to "frequent" manipulative activity is drawn directly from Dr. Ahmed's January, 2015 non-examining assessment (Tr. 149). Because the ALJ addressed limitations created by CTS at later steps of the sequential analysis, a remand is not warranted. *See Maziarz, supra.* Notably, none of the treating, consultative, or non-examining records supports the conclusion that Plaintiff required greater manipulative limitations than those found in the RFC.

For the reasons set forth in Section **A.**, the ALJ did not err in finding that the condition of depression was non-severe. While the treating records show a *history* of depression, Plaintiff consistently demonstrated a normal mood and judgment. The non-examining finding that Plaintiff experienced only mild psychological limitation, standing alone, constitutes substantial evidence in support of the finding that the psychological impairment was non-severe. "[A] non-severe impairment; a mild limitation 'generally' leads to a conclusion that an impairment is not severe, 'unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities.'" *Gier v. Commissioner of Social Security*, 2017 WL 1129913, at *8, fn 9 (E.D.Mich. January 12, 2017)(Grand, M.J.)(*citing* 20 C.F.R. § 404.1520(d)(1)).

While the RFC itself does not make reference to psychological impairment, the ALJ cited the consultative and non-examining evidence showing that the condition did not create any degree of limitation in   understanding, carrying out, and remembering simple instructions; judgment; interacting with others; and dealing with workplace change (Tr. 30-

32). *See* SSR 85-28*, supra,* at \*3. While the ALJ placed his analysis of the Plaintiff work-related mental abilities before the RFC, a remand is not warranted simply to "cut and paste" a perfectly cogent discussion and conclusions to the next page. While Plaintiff faults the ALJ for the catch-all statement that the non-severe impairments had been considered at the later step of his analysis (Tr. 32), his statement, coupled by a vigorous discussion of the records and his conclusions is sufficient rationale for declining to include mental limitations in the RFC.

Because the ALJ's determination was well supported and well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #24] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #17] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address

specifically, and in the same order raised, each issue contained within the objections.




                                    s/ R. Steven Whalen
                                    R. STEVEN WHALEN
                                    UNITED STATES MAGISTRATE JUDGE
Dated: July 2, 2018


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on July 2, 2018, electronically and/or by U.S. mail.

                                    s/Carolyn M. Ciesla
                                    Case Manager to the
                                    Honorable R. Steven Whalen